STATE OF NEW JERSEY, DEPART-
MENT OF ENVIRONMENTAL PRO-
TECTION AND ENERGY, Plaintiff,

v.

GLOUCESTER ENVIRONMENTAL
MANAGEMENT SERVICES,
INC., et al.

Civ. No. 84–0152(JBS).

United States District Court,
D. New Jersey.

April 23, 1993.

John S. Fitzpatrick, Dennis R. O'Brien, Fitzpatrick, Reilly, Supple & Gaul, New Providence, NJ, Liaison Counsel for Municipalities Group.

Theodore Aden, Maria J. Dittmar, Ellen B. Silverman, LeBoeuf, Lamb, Leiby & Mac-Rae, Newark, NJ, for Moving Municipalities.

John F. Lynch, Jennifer L. Kapell, Dennis M. Helewa, Carpenter, Bennett & Morrissey, Newark, NJ, Liaison Counsel for Generator Group.

William Greenberg, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, NJ, Liaison Counsel for defendant Gloucester Tp.

John Kearney, Kenney & Kearney, Cherry Hill, NJ, Jeffrey P. Heppard, Parker, McCay & Criscuolo, Marlton, NJ, Co–Liaison Counsel for Operators Group.

James C. Orr, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, NJ, Liaison Counsel for Transporters Group.

Edward Devine, Deputy Atty. Gen., Dept. of Law & Public Safety Div. of Law, Trenton, NJ, for plaintiff.

## OPINION

SIMANDLE, District Judge:

This matter arises out of the ongoing litigation surrounding the Gloucester Environmental Management Services, Inc. ("GEMS") Landfill. The GEMS Landfill is a Super-

fund [1] site ranked twelfth on the U.S. Environmental Protection Agency's National Priorities List.[2] The case arises from the efforts of plaintiff, the State of New Jersey, Department of Environmental Protection and Energy ("DEPE"), seeking to compel various parties—including the alleged past and present owners of the landfill, various alleged transporters and generally industrial and commercial generators of the landfill's hazardous wastes—to perform remedial activities to redress conditions at the landfill. After a series of amendments to pleadings previously permitted by the court, the DEPE has asserted direct claims against several hundred defendants, as discussed below.[3] One group of parties—the Generators Group [4]—has filed a Third–Party Complaint against 52 municipalities, seeking contribution from these local municipalities arising from their alleged generation and disposal of hazardous substances at the landfill.

Many of the third-party defendant municipalities have moved [5] to dismiss the third-party complaint against them and have presented a pure issue of law for resolution. That issue is whether municipalities which disposed of municipal solid waste ("MSW") are liable as generators of a "hazardous substance" under the terms of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675

(1988) ("CERCLA"), or the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11, et seq. ("the Spill Act"). The municipalities also argue that the New Jersey Tort Claims Act provides them with protection from common law theories of contribution.

For the purposes of this motion, the municipalities assume that municipal solid waste may contain incidental amounts of hazardous substances arising from household products. Municipalities Brief at 7. The municipalities' argument is best summed up with language from their own brief: "In enacting CERCLA, Congress did not intend to create potential liability for municipalities that collect or transport household waste. This is evidenced by the fact that the Resource Conservation and Recovery Act (hereinafter "RCRA"),[6] the only federal environmental statute that specifically addresses the issue of household waste, specifically excludes it from the definition of 'hazardous substance.'" Third–Party Defendant Municipalities Brief in Support of Summary Judgment at 8 (hereinafter "Municipalities' Brief"). To support their claim that they are exempt from liability under CERCLA and the Spill Act, the municipalities argue that the United States Congress and the New Jersey State Legislature intended MSW to be exempted

1. A Superfund site is a waste facility identified by the U.S. Environmental Protection Agency for inclusion on the listing of sites believed to be of special significance with respect to the discharge of imminent threshold discharge of hazardous substances into the environment within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601–9675 (1988) ("CERCLA").

2. 40 C.F.R. Part 300, App. B at 200 (1992). The National Priorities List is compiled pursuant to CERCLA section 105, 42 U.S.C. § 9605, meaning the list of "uncontrolled hazardous substance releases in the United States that are priorities for long-term remedial evaluation and response." 40 C.F.R. § 300.5 (1992).

3. A more complete procedural history of this case appears in NJDEP v. GEMS, Inc., 719 F.Supp. 325, 327, 332 (D.N.J.1989).

4. For a discussion of the underlying organization of the potentially responsible parties in this action into five Liaison Groups, consisting of Own-

ers, Operators, Transporters, Generators, and Municipalities, see NJDEP v. GEMS, Inc., 138 F.R.D. 421, 426–427 (D.N.J.1991).

5. Of the 52 members of the Municipalities Group, only the following 33 have joined in this motion to dismiss: the Borough of Audubon, City of Burlington, City of Camden, Borough of Chesilhurst, Borough of Clayton, Borough of Clementon, Borough of Collingswood, Township of Deptford, Township of Evesham, Borough of Gibbsboro, Borough of Haddonfield, Borough of Hi–Nella, Borough of Laurel Springs, Township of Monroe, Borough of Palmyra, Township of Pennsauken, Borough of Runnemede, Borough of Somerdale, Borough of Stratford, City of Vineland, Township of Voorhees, Township of Washington, Borough of Westville, Township of Winslow, Borough of Woodbury Heights, Borough of Woodlynne and County of Delaware, Borough of Haddon Heights, Borough of Pine Hill, Borough of Barrington, Township of Upper Darby, Borough of Bellmawr, and Borough of Mt. Ephraim.

6. RCRA is codified at 42 U.S.C. § 6921, et seq.

from treatment as a "hazardous substance" under those statutes.

Opposition to this motion was submitted by third-party plaintiff Generators Group and the landfill's present owner, defendant Gloucester Township. Following an extensive review of the relevant statutes and their legislative history, and after considering the arguments of counsel, this court holds that municipalities were not intended to be *per se* exempt under either CERCLA or the Spill Act and that municipal solid waste is includable in the definitions of hazardous substances under CERCLA[7] and the Spill Act. The municipalities' motion for summary judgment in this case is therefore denied with respect to all issues.

## BACKGROUND

The GEMS landfill was owned by the Township of Gloucester and was operated by Amadei Sand & Gravel, Inc., GEMS, Inc., and others between the late 1950s and 1980 when the State of New Jersey ordered its closure. *N.J. Dept. of Env. Prot. v. Gloucester Env. Mgt.*, 719 F.Supp. 325, 328 (D.N.J. 1989). While operational, the GEMS landfill received municipal and industrial liquid and solid waste, including large amounts of toxic substances, from hundreds of sources. *Id.*

The New Jersey Department of Environmental Protection ("NJDEP") first brought this lawsuit in the Superior Court of New Jersey in 1980, "seeking proper closure of the landfill, recovery of response costs, and penalties." *Id.* The case was removed to this court in 1984, and this court has retained subject matter jurisdiction. *Id.* at 333–342.

In 1987, several of the alleged Generators filed this third-party complaint against the municipalities, seeking contribution for CERCLA cleanup costs. Third–Party Complaint (filed Nov. 6, 1987) at 8. The third-party plaintiffs subsequently filed two amended third-party complaints, one on April 14, 1988, and the other on October 24, 1990. In addition to statutory claims under

CERCLA and the New Jersey Spill Act, the Second Amended Third–Party Complaint contained common law claims of negligence, public and private nuisance, claims under the New Jersey Tortfeasors Act and claims based on principles of equity.

## DISCUSSION

### I. CERCLA

CERCLA was enacted by the United States Congress in 1980 and was designed as a remedial statute. Congress intended its legislation "to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten[ ] the environment and human health." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197 (2d Cir. 1992). CERCLA was also intended to "assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created." *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1455 (9th Cir.1986) (citing statement of Rep. Florio, 126 Cong.Rec. 31964).

Under § 107 of CERCLA, 42 U.S.C. § 9607, the EPA is authorized to recover its cleanup costs from responsible parties, 42 U.S.C. § 9607(a)(4)(A), and private parties who are held responsible may, in turn, recover their response costs from other potentially responsible parties ("PRPs"), under § 113(f) of CERCLA, 42 U.S.C. § 9613(f).

There are four classes of PRPs under CERCLA. The first consists of present owners and operators of facilities and the second includes some past owners and operators. CERCLA §§ 107(a)(1), (2); 42 U.S.C. § 9607(a)(1), (2). The third class consists of those persons who generated or arranged for the disposal or treatment of hazardous substances and forms the basis for the CERCLA action brought against the defendant third-party plaintiff Generators giving rise to the third-party complaint against the municipali-

---

7. This court thus agrees, for reasons stated herein, with the holdings in the only other previously reported cases on this issue, namely *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192 (2d Cir.1992),

and *Transportation Leasing Co. v. California*, 21 Envtl.L.Rep. 20826, 32 ERC 1499, 1990 WL 300777, 1990 U.S. Dist. Lexis 18193 (C.D.Cal. 1990).

ties in this case.[8] CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3). The fourth class includes transporters of hazardous substances. CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4).

■ CERCLA imposes strict liability upon PRPs. *See e.g. Murtha,* 958 F.2d at 1198; *General Electric Co. v. Litton Industrial Automation Systems,* 920 F.2d 1415, 1418 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991); *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir. 1988); *United States v. Kramer,* 757 F.Supp. 397, 419 (D.N.J.1991). Where environmental harm is indivisible, liability is joint and several for initial defendants. *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1506–08 (6th Cir.1989), *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1983). CERCLA defendants bear the burden of demonstrating that the harm is divisible, and that their liability thus should not be joint and several. *Kramer,* 757 F.Supp. at 422 (citations omitted). Third-party defendants such as the Municipalities here are, by judicial precedent, only severally liable for contribution under § 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1). *Kramer,* 757 F.Supp. at 414. Since CERCLA is remedial, it "must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup." *Murtha,* 958 F.2d at 1198. The only defenses to CERCLA liability arise from acts of God, acts of war, or certain acts or omissions of third parties having no contractual rela-

tionship with the defendant. 42 U.S.C. § 9607(b).

■ Under CERCLA a *prima facie* cause of action will be established where a plaintiff has shown: (1) that a defendant fits one of the four classes of PRPs identified in 42 U.S.C. § 9607(a); (2) that the site in question is a "facility" under 42 U.S.C. § 9601(9); (3) that there is a release or a threatened release of hazardous substances at that facility; (4) that the plaintiff has incurred costs relating to such release or threatened release; and (5) that the costs and response actions conform to the National Contingency Plan established under CERCLA and administered by the EPA. *See Murtha,* 958 F.2d at 1198. In this case, as in *Murtha,* the "municipalities' summary judgment motion turns on whether their arranging for the disposal of municipal solid waste satisfies the first and third elements." *Id.* Also as in *Murtha,* "[s]ince release or threatened release is not here at issue, discussion of the third element ... turns to whether [MSW] falls within CERCLA's definition of hazardous substance." *Id.* at 1199.

### A. *Municipalities as PRPs*

■ It is clear from the definition of "person" in 42 U.S.C. § 9601(21) that municipalities are explicitly included as PRPs for purposes of the liability provisions of 42 U.S.C. § 9607(a).[9] Additional evidence of this Congressional intent to consider municipalities as PRPs comes from CERCLA's limited exceptions to potential municipal liability which are found in 42 U.S.C. §§ 9601(20)(D) and 9607(d)(2).[10] If Congress had the ability to

---

**8.** Section 107(a)(3) imposes liability on:

any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances[.]

42 U.S.C. § 9607(a)(3).

**9.** Under § 101(21) of CERCLA, a person is defined as any "individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, *municipality, commission, political subdivision of a State,* or any interstate body." 42 U.S.C. § 9601(21) (emphasis added).

**10.** 42 U.S.C. § 9601(20)(D) provides:

The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall *not* apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and *such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantive-*

make explicit exemptions from liability in these sections, it had the ability to make exemptions in 42 U.S.C. § 9607(a). The fact that municipalities are "persons" under CERCLA and that no such exceptions were made for municipalities under 42 U.S.C. § 9607(a) is compelling evidence that Congress intended municipalities to be held liable as PRPs under § 9607(a).[11]

### B. MSW as Hazardous Substance

■ The second subject of concern is whether MSW falls within CERCLA's definition of a hazardous substance. "CERCLA defines as hazardous any substance so designated by the EPA pursuant to § 9602 or by any of four other environmental statutes." *Murtha*, 958 F.2d at 1199. The four statutes are the Solid Waste Disposal Act, the Clean Air Act, the Federal Water Pollution Control Act, and the Toxic Substances Control Act. Pursuant to § 9601(14)(B) and under § 9602, the EPA has promulgated a list of over seven hundred hazardous substances, found in Table 302.4 of 40 C.F.R. § 302 (1991). To be considered a hazardous substance under CERCLA, a substance need only be defined as hazardous under any one of the previously mentioned four environmental statutes or under Table 302.4. *Murtha*, 958 F.2d at 1200 (citing *Eagle–Picher Industries, Inc. v. United States EPA*, 759 F.2d 922, 927 (D.C.Cir. 1985); *United States v. Carolawn Co.*, 21

E.R.C. 2124, 2125, 1984 WL 178909 (D.S.C. 1984); *United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143, 1146 (D.Ariz.1984)).

■ Also, section 101(14) of CERCLA, 42 U.S.C. § 9601(14), specifically excludes only petroleum and natural gas from the definition of a hazardous substance. CERCLA makes no distinctions between or among PRPs, nor according to the source of the hazardous substances, in its definition of hazardous substance. "Whether a potentially responsible party is an owner or operator of a facility, or an arranger, generator or transporter of the hazardous substance, or a municipality, individual or chemical manufacturing company is not relevant in determining whether a substance is hazardous." *Murtha*, 958 F.2d at 1200. Additionally, "the concentration of hazardous substances in municipal solid waste—regardless of how low a percentage—is not relevant in deciding whether CERCLA liability is incurred." *Id.* The fact that MSW is not specifically mentioned as a hazardous substance does not exempt it from CERCLA's reach, either. As the Second Circuit Court of Appeals noted in *Murtha*, "For us to consider the whole separate from its hazardous constituent parts would be to engage in semantic sophistry. When a mixture or waste solution contains hazardous substances, that mixture is itself hazardous

---

ly, as any nongovernmental entity, including liability under § 9607 of this title [emphasis added].

42 U.S.C. § 9607(d)(2) provides:

No State or local government shall be liable under this subchapter for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government. For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.

11. Further evidence of this intent is provided by the debate over Senator Lautenberg's proposed amendment to CERCLA presented to the 102nd Congress in 1991. That amendment, which would have exempted municipalities from any

liability under CERCLA, did not win passage into law. "Toxic Cleanup Equity and Acceleration Act," S–1557. A similar fate befell the proposed amendment of Congressman Torricelli in the same Congress. "Toxic Cleanup Equity and Acceleration Act," H.R. 3026. The fact that the 102nd Congress was debating amendments exempting municipalities from liability under CERCLA, while not dispositive, is also evidence that CERCLA as presently constructed provides no such exemption from liability. Also Governor James Florio, who was a major congressional sponsor of both the 1980 CERCLA enactment and the 1986 SARA amendments, has recognized that CERCLA extends liability to municipalities disposing of municipal solid waste that includes incidental amounts of hazardous wastes, see J. Florio, et al., Too–Strict Liability: Making Local Government Entities Pay for Waste Disposal Site Cleanup, 1 *Vill.Env.L.J.* 105, 106–107 and 117 n. 67 (1990), and he has urged amendment to CERCLA and to the Spill Act to protect municipalities from such liability on public policy grounds. *Id.* at 117–121.

for purposes of determining CERCLA liability." *Id.* at 1201.

## C. *The RCRA Exemption for Household Waste*

■ Despite the clear language of CERCLA and the demonstrable congressional intent to hold municipalities liable as PRPs under § 9607(a), the municipalities still maintain that they should be exempt. They rely upon the assertion that Congress intended the exemption for MSW found in regulations implementing RCRA to be incorporated by reference into CERCLA, through § 9601(14)(C). The Second Circuit Court of Appeals addressed precisely this issue in *Murtha* and found the municipalities' argument to be meritless. 958 F.2d at 1201. We find *Murtha*'s reasoning to be persuasive and in accord with our own reading of the statutory materials for reasons now discussed.

In direct contrast to CERCLA's remedial purposes, RCRA was intended to provide a framework for regulation of hazardous wastes. While CERCLA is intended to facilitate the cleanup of past environmental pollution, RCRA is designed to prevent present and future environmental pollution by regulating "ongoing treatment, storage, and disposal of solid and hazardous wastes." *Murtha*, 958 F.2d at 1201. RCRA's household waste exclusion is a regulatory creation which was promulgated due to Congressional concerns that such waste be subjected to less stringent standards during day-to-day management of transportation, storage and disposal. *Id.* at 1201. "This narrow RCRA exemption in no way limits the definition of hazardous substance under CERCLA." *Id.* at 1202. The RCRA exclusion of household waste from the framework of that statute's regulatory impact is stated at 40 C.F.R. § 261.4(b)(1), which provides:

> The following solid wastes are not hazardous wastes:
>
> (1) Household waste, including household waste that has been collected, transported, stored, treated, disposed, recovered ... or reused. "Household waste" means any material (including garbage, trash and sanitary wastes in septic tanks) derived from

households (including single and multiple residences, hotels and motels, bunkhouses, ranger stations, crew quarters, campgrounds, picnic grounds and day use recreation areas).

It is also important to note that CERCLA applies to substances whereas RCRA applies to wastes. Both Congress and the EPA knowingly and deliberately made this distinction. *Murtha*, 958 F.2d at 1202 (citations omitted). Thus, the RCRA exemption which the municipalities argue should be incorporated into CERCLA applies to household wastes, not hazardous substances which are the concern of CERCLA. "This statutory and regulatory distinction is a substantial one and should be preserved, absent a clear legislative intent to the contrary." *Id.*

Counsel for the municipalities have raised, both in their briefs and at oral argument, the point that failure to extend RCRA's exemption to CERCLA creates a conflict between the two statutes. This argument betrays the municipalities' misinterpretation of the underlying purpose of each statute and once again, we find *Murtha*'s reasoning to be persuasive:

> RCRA is preventative; CERCLA is curative. It does not follow that because the environmental risk posed by household waste is deemed insufficient to justify the most stringent regulations governing its day-to-day handling that the environmental harm caused when that risk is realized is insufficient to require holding liable those responsible for that harm.

958 F.2d at 1202. In other words, Congress can rationally choose to exclude household waste from the stringent regulations of RCRA, while including such municipal generators of household waste where it has been deposited into a facility requiring CERCLA remediation due to the release or threatened release of hazardous substances, including such hazardous materials as are routinely present in municipal solid waste.

In addition, as we recognized earlier with respect to the limited exceptions to potential municipal liability found in 42 U.S.C. §§ 9601(20)(D) and 9607(a)(2), the very fact that RCRA does have an exclusion for house-

hold waste demonstrates Congress's and the EPA's ability to make exemptions. Where Congress and the EPA have demonstrated such an ability but have not used that ability in CERCLA or in its implementing regulations, it is not the courts' function to act in their stead, as the municipalities urge this court to do. Moreover, the RCRA exemption is a regulatory creature and as such is subordinate to a legislative enactment such as CERCLA.

Although the municipalities raise important arguments of public policy, we must hold that the most accurate expression of public policy is found within legislative enactments. CERCLA does not exempt municipalities from liability as PRPs under § 9607(a) and, equally clearly, Congress did not intend to incorporate RCRA's household waste exclusion into CERCLA.

CERCLA's non-exclusion of municipal solid wastes from the definition of hazardous substance does not yield a result that is clearly unintended or bizarre. The municipalities herein have conceded for purposes of this motion that their municipal solid wastes contain incidental amounts of hazardous substances. This "incidental amount" of hazardous substances in household wastes may be even smaller than one percent, but it "represents a significant quantity of hazardous waste because of the large volume of garbage involved." W.L. Rathje & D.C. Wilson, *Characterization of Household Hazardous Waste from Marin County, California, and New Orleans, Louisiana* (July 1987).[12] Moreover, the EPA has issued a directive rejecting any interpretation of CERCLA that would categorically exclude household waste

from the definition of "hazardous substances," stating:

> CERCLA does not contain an exclusion from liability for household waste or an exclusion based on the amount of waste generated ... HHW [household hazardous waste] may qualify as a "hazardous substance" if it contains any substance listed in Table 302.4 of 40 C.F.R. Part 302. If a household waste contains a substance that is covered under these CERCLA sections (whether or not it is a RCRA hazardous waste), potential CERCLA liability exists. Communities should recognize that potential liability under CERCLA applies *regardless* of whether the HHW was picked up as a part of a community's routine waste collection service and disposed of in a municipal waste landfill ... or if the HHW was gathered as part of a special collection program and taken to a hazardous waste landfill....

Memorandum from J. Winston Porter, Assistant Administrator for Solid Waste & Emergency Response, USEPA, captioned *Clarification of Issues Pertaining to Household Hazardous Waste Collection Programs*, at 4 (November 1, 1988), quoted. in *Transportation Leasing Co. v. California*, 21 Envtl. L.Rep. 20826, 20827, 32 ERC 1499, 1501, 1990 WL 300777, 1990 U.S. Dist. Lexis 18193, at 6–7 (C.D.Cal.1990).

American households are said to dispose of about 1.6 million tons of hazardous waste annually (*i.e.,* an estimated one percent of the 160 million tons of total municipal solid waste).[13] The municipal solid waste, with its hazardous component, is said to present a considerable hazardous potential [14] at certain sites. While the potential for harm from

---

**12.** These same authors have cautioned that characteristics of municipal solid waste differ depending on location, climate and temperature, as well as the sociometric characteristics of the collection area. W.L. Rathje, W.W. Hughes, D.C. Wilson & D.E. Nelson, *A Characterization of Household Solid Waste*, 26 (Feb. 3, 1986). In any event, the municipalities in the present case have suggested no reason why their municipal wastes are atypical of the generally observed range of hazardous waste content in such studies. Further, these municipalities have chosen not to submit any expert opinion in support of their motion concerning the nature of municipal wastes.

**13.** Meske, The Solid Waste Dilemma: Municipal Liability and Household Hazardous Waste Management, 23 *Envr.L.R.* 355 (1993), citing U.S. EPA, Proceedings of the Fourth National Conference on Household Hazardous Waste Management 4 (1989).

**14.** Ferrey, The Toxic Time Bomb: Municipal Liability for the Cleanup of Hazardous Waste, 57 *Geo.Wash.L.Rev.* 197, 202 (1988); Note, A Proposed Scheme of Municipal Waste Generator Liability, 100 *Yale L.J.* 805–806 (1990).

release of hazardous components at a typical municipal landfill may not be great, this potential may be greatly aggravated at a Superfund site in which municipal wastes in high volumes contribute their hazardous components to the hazardous industrial wastes also on site to yield formidable problems of containment and remediation. It is the volume of hazardous substances in municipal waste, and not the isolated or occasional paint can or pesticide from the individual household, that potentially threatens the environment in a material way as envisioned by CERCLA.

█ This court emphasizes the limited nature of its holding. We are not holding that municipalities will be held equally culpable with other PRPs.[15] That was not the issue presented to us, and even CERCLA suggests that municipalities should not be

held equally culpable due to the relatively low toxicity level of MSW.[16] Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), gives courts the discretion to resolve contribution actions according to "such equitable factors as the court determines are appropriate."[17] *See also U.S. v. Rohm & Haas Co.*, 721 F.Supp. 666, 675 (D.N.J.1989). In enacting CERCLA, members of Congress repeatedly emphasized the environmental degradation and harm caused by industrial hazardous substances,[18] and nothing in this opinion displaces to municipalities any part of the burden that must be predominantly shouldered by the industrial generators and haulers of such wastes. But nothing in the statute or legislative history excludes municipalities from bearing an appropriate share of liability at a Superfund site. We are merely holding that a municipality that has generated or arranged for the disposal of municipal solid

15. We observe that the third-party complaint against these municipalities seeks contribution from them in accord with CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), which allocates CERCLA response costs "using such equitable factors as the court determines are appropriate." Such factors should include the relative amounts of the hazardous substances contributed by the parties, the relative toxic and other hazardous effects of the substances contributed by the parties, *see e.g.*, CERCLA § 122(g), 42 U.S.C. § 9622(g) [factors considered for de minimis settlement eligibility], and such other factors as effectuate the legislative intent such as the profitability of the selected disposal method and the public necessity for such disposal; such factors would suggest a very low culpability index for municipal generators of municipal solid waste.

16. Likewise, the EPA, in its Interim Municipal Settlement Policy, 54 Fed.Reg. 51,071 (Dec. 12, 1989), announced that it does not intend to pursue municipalities in CERCLA settlements for the discard of household wastes, because pursuing municipalities that contributed only low levels of contamination through hazardous substances in comparison to private industrial or commercial wastes is not cost effective. *Id.* at 51,072–73. EPA's settlement policy is instructive because the EPA has recognized that CERCLA does not exempt municipal solid wastes from liability; otherwise, there would be no need for the exercise of administrative discretion of whether it is cost-effective to include such wastes for CERCLA settlement purposes. The District Court in *Murtha* observed, and we agree: "The EPA's Interim Municipal Settlement Policy ... acknowledges that [municipal solid waste] may contain hazardous substances ... and responsible parties, including municipalities, will be notified as PRPs."

*B.F. Goodrich Co. v. Murtha*, 754 F.Supp. 960, 966 (D.Conn.1991), *aff'd*, 958 F.2d 1192 (2d Cir. 1992).

17. This court further notes that "'liability of initial defendants sued by the government under [§ 9607(a)] ... is joint and several[, but according to judicial precedent,] ... the liability of third-party defendants is several only.'" *Kramer*, 757 F.Supp. 397, 414.

18. As the movants have aptly pointed out, "The legislative history of CERCLA includes a catalogue of the worst such sites—all contaminated by industrial hazardous wastes. *See* H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 18–21, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6121–23, ... (listing sites such as Love Canal, New York as examples)." Municipalities' Br. at 15. The legislative history expressed the congressional intent that:

> [S]ociety should not bear the costs of protecting the public from hazards produced in the past by a generator, transporter, consumer, or dumpsite owner or operator *who has profited or otherwise benefited from commerce involving these substances* and now wishes to be insulated from any continuing responsibilities for the present hazards to society that have been created ...

S.Rep. No. 848, 96th Cong., 2d Sess at 98 (1980) (emphasis added). Such language expresses the state's intent that those responsible for environmental degradation by the disposal of hazardous wastes must pay for it. When municipalities discharge substantial quantities of hazardous substances, they too must bear a fair share of responsibility when environmental calamity results at a site.

wastes at a facility may be liable under CERCLA § 107(a)(3) for an equitable share of responsibility upon a third-party contribution claim under CERCLA § 113(f). The Municipalities' motion to dismiss CERCLA claims arising under § 113 of CERCLA, 42 U.S.C. § 9613, will be denied.

## II. NEW JERSEY SPILL ACT

■ Our analysis of the Spill Act is exactly the same as our analysis of CERCLA. This is because the Spill Act, which is the State's analog to CERCLA, specifically incorporates CERCLA's definition of hazardous substances. N.J.S.A. 58:10–23.11b(k).[19] The Spill Act imposes strict joint and several liability on "any person who has discharged a hazardous substance...." N.J.S.A. 58:10–23.11g(c). The Spill Act defines "person" as including public entities, such as "the United States, the State of New Jersey and any of its political subdivisions or agents...." N.J.S.A. 58:10–23.11b(o ).

The municipalities argue that household waste should be excluded from the Spill Act's list of hazardous substances because such waste is excluded from regulation under New Jersey's Solid Waste Management Act, the State's analog to RCRA. This is the same argument on the state level that the municipalities made on the federal level. The analysis is the same also. In construing the Spill Act, this court is guided by the New Jersey Supreme Court, which has held that the courts should properly look to analogous federal statutes where operative terminology in the state statute has been borrowed from federal provisions. *GATX Term. Corp. v. New Jersey Department of Environmental Protection*, 86 N.J. 46, 53–54, 429 A.2d 355 (1981), citing *Galloway Twp. Board of Education v. Galloway Twp.*, 78 N.J. 1, 10, 393 A.2d 207 (1978). Because the Spill Act's definition of hazardous substance specifically incorporates the U.S. EPA's listing of CERCLA hazardous substances,[20] the analogy between CERCLA hazardous substances and Spill Act hazardous substances could hardly be more complete. Moreover, the New Jersey Legislature made explicit exceptions for sewage and sewage sludge from the Spill Act.[21] If it had wanted to exclude all MSW from the Spill Act's coverage, it would have done so. This court can not act in place of the legislature. This court is not empowered to substitute its judgment of the wisdom of public policy in place of the Legislature, where the Legislature has spoken. Any redress from the Legislature's policy determination must be sought before that body. The Municipalities' motion to dismiss claims for contribution under the Spill Act will be denied.

## III. NEW JERSEY TORT CLAIMS ACT

The final argument made by the municipalities is that the Generators' state law contribution claims "are barred by the terms and conditions of the New Jersey Tort Claims Act." Municipalities' Brief at 30.

The Generators' Second Amended Third-Party Complaint contains five counts in which Generators seek contribution from the Municipalities, summarized as follows:

> Pursuant to 42 U.S.C. § 9613(f)(1) for response costs already incurred and to be incurred in the future by the Third-Party

---

19. Under the Spill Act, hazardous substances are defined in N.J.S.A. 58:10–23.11b(k) as:

> the "environmental hazardous substances" on the environmental hazardous substance list adopted by the department pursuant to Section 4 of P.L.1983, C. 315 (C. 34:5A–4); such elements and compounds including petroleum products, which are defined as such by the Department, after public hearing, and which shall be consistent with the maximum extent possible with, and which shall include, the list of hazardous substances adopted by the federal Environmental Protection Agency pursuant to section 311 of the federal Water Pollution Control Act Amendments of 1972, ... as amended by the Clean Water Act of 1977 ...; the list of

toxic pollutants designated by Congress or the EPA pursuant to section 307 of that act; *and the list of hazardous substances adopted by the federal Environmental Protection Agency pursuant to § 101 of the "Comprehensive Environmental Response, Compensation and Liability Act of 1980,"* Pub.L. 96–510 (42 U.S.C. § 9601 et seq.); provided, however, that sewage and sewage sludge will not be considered as hazardous substances for the purposes of this Act. [Emphasis added.]

20. *Id.*

21. *Id.*

Plaintiffs consistent with the National Contingency Plan.

(Paragraphs 103–105, Count 1);

Pursuant to principles of equity as well as the New Jersey Joint Tortfeasors Contribution Law, since they may be responsible for and/or liable to the NJDEP pursuant to the statutes and common laws of the State of New Jersey for the remediation of the GEMS Landfill and/or the costs associated with its cleanup because they "generated hazardous substances which they caused to be transported to the GEMS Landfill"; generated and/or transported or caused to be transported to the GEMS Landfill, municipal waste containing hazardous substances.

(Paragraphs 107–111, Count 2);

Under various state environmental statutes including the Spill Compensation and Control Act, N.J.S.A. 58:10–23.11 et seq. jointly and severally without regard to fault for cleanup and removal costs NJDEP has ordered at the GEMS Landfill site.

(Paragraphs 115–121, Count 3);

As persons responsible jointly and severally for the discharge of hazardous substances in violation of N.J.S.A. 58:10–23.11, et seq. negligently caused to be transported to GEMS as municipal waste and/or other wastes which contained hazardous substances.

(Paragraphs 124–125, Count 4); and

As causing conditions at the GEMS Landfill that resulted in the public and private nuisance alleged to exist by the NJDEP in its Complaint in this matter.

(Paragraph 127, Count 5).

At issue in this aspect of the Municipalities' motion are the contribution claims arising at state law contained in Count 2 (New Jersey statutes and common laws for remediation and cleanup costs), Count 3 (New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11, *et seq.*, without regard to fault), Count 4 (*id.*, arising from negligently causing hazardous substances to be transferred), and Count 5 (causing public and private nuisance). The Municipalities do not allege a New Jersey Tort Claims Act immunity for an otherwise valid CERCLA contribution claim. See Municipalities' Brief at 30 and Municipalities' Reply Brief at 13.

The Municipalities make several arguments based upon the New Jersey Tort Claims Act, which are considered seriatim:

(a) The Tort Claims Act cannot be a basis for the Generators' contribution claims, since the Act contains no express provision for liability;

(b) The Municipalities are immune from Tort Claims Act liability because their decisions to provide a governmental service such as municipal solid waste disposal are immunized as legislative decisionmaking. (N.J.S.A. 59:2–3c) or as decisions concerning allocation of governmental resources (N.J.S.A. 59:2–3d);

(c) The Tort Claims Act bars recovery in strict liability (N.J.S.A. 59:9–2(b));

(d) Any recovery for claims arising at state law against a municipal entity is governed by comparative negligence provision of N.J.S.A. 59:9–3.1.

### A. *N.J. Tort Claims Act Liability*

The New Jersey Tort Claims Act, passed in 1972, declares the legislative will that a public entity's liability for an injury is to be determined by the Act itself, stating:

Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.

N.J.S.A. 59:2–1(a). The Supreme Court of New Jersey has thus noted that the Act intended to re-establish governmental immunity except as liability is otherwise permitted, stating: "The Tort Claims Act, N.J.S.A. 59:1–1 to 12–3, reestablished sovereign immunity, except where there is a statutory declaration of liability." *Burke v. Deiner*, 97 N.J. 465, 472, 479 A.2d 393 (1984).

The Municipalities argue that no express provision for liability for the types of claims asserted here is contained in the statute.

■ As to the statutory claims for contribution arising under the Spill Act (Counts 2, 3 and 4 of the Second Amended Third–Party

Complaint, *supra*), the Legislature's 1976 enactment of the Spill Act expressly imposed liability upon municipalities, as discussed above, under N.J.S.A. 58:10–23.11b(*o*). It would be illogical to assume that the Legislature which created municipal liability for conduct violating the Spill Act in 1976 also meant to extend a blanket exemption to municipalities by force of the earlier Tort Claims Act. The more specific statute creating potential municipal liability under the Spill Act will not be nullified by the Tort Claims Act in the absence of a clear legislative intent to do so, because "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). Thus, the absence of a specific provision of the Tort Claims Act permitting liability does not undercut the existence of claims against the municipalities arising under the Spill Act.

The non-Spill Act claim for contribution has been characterized as a nuisance claim (Second Amended Third–Party Complaint, Count 5, *supra*). For this claim, the Generators essentially rely on evidence that the Municipalities either directly hauled municipal solid waste to the GEMS Landfill or entered into garbage collection contracts with private haulers who transported municipal waste to GEMS with or without the knowledge of the particular municipality, creating and contributing to the nuisance alleged by NJDEPE. The Generators argue that claims against municipalities for nuisance for the discharge of hazardous substances are not, as a matter of law, barred by the New Jersey Tort Claims Act, citing *Ayers v. Jackson Twp.*, 106 N.J. 557, 525 A.2d 287 (1987) and *Birchwood Lakes Colony Club v. Medford Lakes*, 90 N.J. 582, 593, 449 A.2d 472 (1982).

Indeed, the *Ayers* court largely affirmed a judgment in favor of plaintiffs whose well water was contaminated by toxic pollutants leaching from the defendant municipality's landfill under the New Jersey Tort Claims Act, where the jury found that the township had created a nuisance and a dangerous condition by virtue of its operation of the landfill. *Ayers*, 106 N.J. at 565–567, 525 A.2d 287. Such liability may be found where the plaintiffs demonstrated that defendant's conduct was "palpably unreasonable" under N.J.S.A. 59:4–2, as noted by the court. *Id.* at 565, 525 A.2d 287. Similarly, in *Birchwood Lakes*, the Supreme Court held that an action for public nuisance can be maintained against a municipality for its operation of a sewage treatment plant where its actions are found to be palpably unreasonable under N.J.S.A. 59:4–2. *Birchwood Lakes*, 90 N.J. at 594–596, 449 A.2d 472.

Both *Ayers* and *Birchwood*, however, concerned a municipality's liability for nuisance arising from its own property, and not from disposal of municipal wastes elsewhere. In each instance, plaintiffs' water supplies were contaminated by the municipalities' operation of public works—the landfill and the sewage treatment plant. In the present case, on the other hand, the Generators allege that the Municipalities "contributed to conditions at the GEMS Landfill that resulted in the public and private nuisance alleged to exist by the NJDEP in its Complaint in this matter." Second Amended Third–Party Complaint, Count 5, ¶ 127). Whether the New Jersey Tort Claims Act recognizes liability for nuisance due to conduct of a municipality upon lands not owned by that municipality is a question not addressed in *Ayers* or *Birchwood Lakes*.

In *Birchwood Lakes*, Justice O'Hearn recognized that municipal liability for nuisance under the Tort Claims Act derives from two sections of the Act—N.J.S.A. 59:4–2 and 59:2–2—interpreted "in light of the history of municipal liability in this area." *Birchwood Lakes*, 90 N.J. at 593, 449 A.2d 472. The first of these sources—N.J.S.A. 59:4–2—pertains to public entity liability "for injury caused by a condition of its property," [22]

---

22. N.J.S.A. 59:4–2 states:

A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the

which is inapposite in this case. None of the third-party defendant municipalities owned the GEMS Landfill, nor is municipal solid waste "property" of the municipality for purposes of section 4–2. The second statutory source, N.J.S.A. 59:2–2, imposes public entity liability, subject to immunities elsewhere in the Act, for acts or omissions of a public employee "in the same manner and to the same extent as a private individual under like circumstances." [23] We thus search for precedent to determine whether the law of nuisance recognizes a cause of action for a private party's disposal of solid waste upon the lands of another.

"The term 'nuisance' is incapable of an exact and exhaustive definition which will fit all cases ... The term is so comprehensive that it has been applied to almost all wrongs which have interfered with the rights of the citizen in person, property, the enjoyment of property, or comfort." 58 Am.Jur.2d, *Nuisances*, § 1 (1989). The one who creates or contributes to the creation of the nuisance is generally liable for that nuisance. *Id.* at § 116. The *Restatement (Second) of Torts* holds liable not only those who carry on an activity, but those who participate "to a substantial extent in carrying it on." *Restatement (Second) of Torts*, § 834. The definitions of public [24] and private [25] nuisance are equally broad. Whether the municipalities hauled their own municipal waste or hired independent contractors to do the hauling is not relevant to the municipalities' liability.

*Restatement (Second) of Torts*, § 427B. The definition of nuisance found in the *Corpus Juris Secundum* and cited by the Superior Court of New Jersey in *Township of Cherry Hill v. N.J. Racing Comm'n*, 131 N.J.Super. 125, 144, 328 A.2d 653 (Div.1974), is in keeping with the focus on interference with another's land or with public rights, and not on the ownership of the land from which the interference emanates:

> [I]n legal phraseology [nuisance] applies to that class of wrongs which arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real *or personal*, *or* from his own improper, indecent, or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, and producing material annoyance, inconvenience, discomfort, or hurt.

66 C.J.S., *Nuisances*, § 1 (cited in *Township of Cherry Hill*, 131 N.J.Super. at 144, 328 A.2d 653 (emphasis added)).

Although the issue is far from clear,[26] the common law of nuisance can support, under appropriate circumstances, a cause of action for a private party's disposal of solid waste upon the lands of another. The fact that the municipalities did not own the GEMS landfill site does not undermine a nuisance claim. It is enough for a nuisance claim to stand that the municipalities allegedly contributed to the creation of a situation which, it is alleged,

---

kind of injury which was incurred, and that either:

  a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

  b. a public entity had actual or constructive notice of the dangerous condition under section 59:4–3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

23. N.J.S.A. 59:2–2 states:

  a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances.

  b. A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.

24. "A public nuisance is an unreasonable interference with a right common to the general public." *Restatement (Second) Torts*, § 821B(1).

25. "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Restatement (Second) Torts*, § 821D.

26. The parties have not addressed this issue of analogous liability for a private party's conduct in disposing its wastes on another's lands and are therefore invited to focus upon it in any subsequent briefing.

unreasonably interfered with a right common to the general public. Since an action against a private individual could be maintained on the facts of this case, N.J.S.A. 59:2–2 supports holding the municipalities liable for nuisance if all the other elements of nuisance are proven against them.

The inquiry does not end here, however. The New Jersey Tort Claims Act at N.J.S.A. 59:2–1(b) states that "[a]ny liability of a public entity established by this act is subject to any immunity of the public entity." Therefore, the municipalities argue, even if the common law would support a nuisance claim against a private party in this case, the discretionary immunity provided them by N.J.S.A. 59:2–3 precludes the nuisance claims against them. They have argued that the actions for which they are being sued for contribution resulted from the "exercise of [municipal] judgment or discretion." N.J.S.A. 59:2–3(a). The municipalities claim that the decision whether to pick up household waste and where to send that waste once picked up is a matter dealing with "the provision of adequate governmental services," N.J.S.A. 59:2–3(c), and that these decisions were taken as a conscious exercise of discretion. This may indeed be true, but the record is devoid of any evidence of that conscious decision by individual municipalities. In light of this silent record, the immunity provided by N.J.S.A. 59:2–3 has not been shown upon the present record and summary judgment cannot be granted to the municipalities.

We emphasize that any of the common law tort claims brought against the municipalities must be consistent with the provisions of the New Jersey Tort Claims Act. Since strict liability is specifically excluded as a basis of recovery by the Act, N.J.S.A. 59:9–2(b), any municipal liability in common law tort will attach only upon a showing of the necessary elements of fault required to prove negligence. In addition, if negligence is proven, any municipal liability for damages is several, N.J.S.A. 59:9–3, and must be apportioned pursuant to the terms of N.J.S.A. 59:9–3.1, which is based on principles of comparative negligence.

CONCLUSION

For the foregoing reasons the municipalities' Type II motions for summary judgment will be denied.

An appropriate order will be entered.

ORDER

This matter having come before the court upon the Type II Motion of various municipal third-party defendants[1] seeking summary judgment to dismiss the second amended third-party complaint against them; and

For reasons stated in the Opinion of today's date; IT IS this 23rd day of April, 1993 hereby ORDERED that the motion be, and it hereby is denied.

---

1. Of the 52 members of the Municipalities Group, only the following 33 have joined in this motion to dismiss: the Borough of Audubon, City of Burlington, City of Camden, Borough of Chesilhurst, Borough of Clayton, Borough of Clementon, Borough of Collingswood, Township of Deptford, Township of Evesham, Borough of Gibbsboro, Borough of Haddonfield, Borough of Hi–Nella, Borough of Laurel Springs, Township of Monroe, Borough of Palmyra, Township of Pennsauken, Borough of Runnemede, Borough of Somerdale, Borough of Stratford, City of Vineland, Township of Voorhees, Township of Washington, Borough of Westville, Township of Winslow, Borough of Woodbury Heights, Borough of Woodlynne and County of Delaware, Borough of Haddon Heights, Borough of Pine Hill, Borough of Barrington, Township of Upper Darby, Borough of Bellmawr, and Borough of Mt. Ephraim.